Because Plaintiffs are not entitled to a jury trial ›n the instant cause of action, the Court will grant Defendants' Motion to Strike Plaintiffs' Jury Demand.

ACCORDINGLY,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss Portions of Plaintiffs' First Amended Complaint [docket # 29] is **GRANTED** as to Counts VII through X, and **DENIED** as to Count III.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss Portions of Plaintiffs' First Amended Complaint [docket # 29] is **DENIED** without prejudice as to Defendant C & SIT's motion to be dismissed as a Defendant from Counts II, III, IV, V and VI of Plaintiffs' First Amended Complaint, and **GRANTED** as to Defendant IAC's motion to be dismissed as a Defendant from Count V of Plaintiffs' First Amended Complaint.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Claims for Punitive and Extracontractual Damages [docket # 30] is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Plaintiffs' Demand for Jury Trial [docket # 28] is **GRANTED.**

**UNITED STATES of America, Plaintiff,**

v.

**Herbert J. EAGLE · THUNDER, Defendant.**

CR 88–30054–01.
CIV. 92–3038.

United States District Court,
D. South Dakota,
Central Division.

Feb. 24, 1994.

Bruce Ellison, Rapid City, SD, Caroline B. Briggs, Flora, IN, for defendant.

Dennis R. Holmes, Asst. U.S. Atty., Pierre, SD, for plaintiff.

## *ORDER*

JOHN B. JONES, Chief Judge.

The Court referred the above-entitled matter to Magistrate Mark Moreno pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules Governing Section 2255 Proceedings in the United States District Courts. Magistrate Moreno filed his Findings of Fact, Report, and Recommendations for Disposition ("Report") on January 6, 1994. Both parties have filed written objections to the Report.

The Court has made a de novo determination of the findings and recommendations of the magistrate pursuant to 28 U.S.C. § 636.

The Government's objection concerning the admission of the co-defendant's rape conviction does not affect the magistrate's recommended disposition of the motion and is rejected.

As to Eagle Thunder's objections, Ground One concerning evidence of the co-defendant's prior rape conviction, Ground Two involving other acts evidence, Ground Five involving severance, and Ground Seven involving voir dire questions as to racial prejudice are all procedurally barred. As to Ground Three involving Eagle Thunder's Confrontation Clause rights and Ground Four involving newly discovered evidence the Court accepts the magistrate's Report for the reasons given in the magistrate's Report. As to Ground Six, which alleges ineffective assistance of counsel, Eagle Thunder has failed to satisfy the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Therefore, upon the record herein,

IT IS ORDERED:

(1) That the Findings of Fact, Report, and Recommendations for Disposition of Magistrate Mark Moreno dated January 6, 1994, shall be and is hereby adopted as the Findings of Fact and Conclusions of Law herein.

(2) That the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence By A Person In Federal Custody filed by Defendant be, and is hereby, dismissed with prejudice for failure to state a valid ground for relief under 28 U.S.C. § 2255.

## FINDINGS OF FACT, REPORT AND RECOMMENDATIONS FOR DISPOSITION

MARK A. MORENO, United States Magistrate Judge.

### INTRODUCTION

The above-entitled matter was referred to me by the District Court[1] pursuant to 28 U.S.C. § 636(b)(1)(B), for submission to the Court of proposed findings of fact, report and recommendations for disposition of the matter.

Having carefully reviewed and considered all of the records on file in Civil No. 92–3038 and Criminal Nos. 88–30054–01 and 88–30054–02, together with the affidavits, memoranda and other materials submitted by the parties, I now make and propose the following findings of fact, report and recommendations for disposition.

### PROCEDURAL HISTORY AND BACKGROUND

Plaintiff/Petitioner, Herbert J. Eagle Thunder (hereinafter "Eagle Thunder") and Hobart Garneaux were charged by joint indictment, filed on August 18, 1988, with Kidnapping in violation of 18 U.S.C. §§ 1153 and 1201(a)(2), Aggravated Sexual Abuse in violation of 18 U.S.C. §§ 1153, 2241(a)(1), and 2245(2)(A) and Aggravated Sexual Abuse in violation of 18 U.S.C. §§ 1153, 2241(c) and 2245(2)(A). Eagle Thunder pled not guilty to all three charges and was tried with Garneaux by a jury. On December 23, 1988, the jury found Eagle Thunder guilty of the two Aggravated Sexual Abuse charges but not guilty of the Kidnapping charge. At the same time, the jury convicted Garneaux of the Kidnapping charge but acquitted him of the two Aggravated Sexual Abuse charges.

The District Court sentenced Eagle Thunder to serve concurrent sentences of 365 months imprisonment for the Aggravated Sexual Abuse offenses, to be followed by

---

1. The Honorable Donald J. Porter, Senior United States District Judge, presiding.

three years of supervised release. The Court sentenced Garneaux to 327 months imprisonment on the Kidnapping of offense, to be followed by three years supervised release. Garneaux later died while in prison.

Eagle Thunder and Garneaux subsequently appealed their convictions to the Eighth Circuit Court of Appeals. The Eighth Circuit affirmed both convictions but remanded Eagle Thunder's case to the District Court for resentencing. *See United States v. Eagle Thunder*, 893 F.2d 950 (8th Cir.1990). At a resentencing hearing held on October 29, 1990, the District Court sentenced Eagle Thunder to 235 months in custody and the same three years of supervised release (the sentences on both offenses were concurrent).

On September 29, 1992, Eagle Thunder filed his initial motion pursuant to 28 U.S.C. § 2255. An amended motion was later filed on September 24, 1993.

## FINDINGS OF FACT

The facts surrounding Eagle Thunder's convictions are set forth in the Eighth Circuit's opinion in *United States v. Eagle Thunder*, 893 F.2d at 951–52. The facts relevant to Eagle Thunder's § 2255 motion will be summarized here.

On the evening of July 22, 1988, VLG, an eleven-year-old girl, and JTL, a nine-year-old boy, and another child were playing at a playground in the community of West Brule, located on the Lower Brule Indian Reservation. At approximately 10:30 p.m. that evening, Garneaux stopped his vehicle near the playground where VLG, JTL and the other child were playing. Garneaux asked VLG if she wanted to "ride around" and she said "yeah", but told him that she had to be home by 10:00 o'clock, p.m. Garneaux agreed and VLG and JTL got in the back seat of the vehicle. Verna Roundhead was in the passenger seat. Garneaux drove Roundhead to her home in Fort Thompson, South Dakota, about seventeen miles from West Brule. At some time during the trip to Fort Thompson, VLG grabbed Garneaux's neck and told him to take her home. After Garneaux took Roundhead home, VLG asked him to take her to her mother who was playing bingo in

Lower Brule, South Dakota, but Garneaux refused.

At some point in time while in Fort Thompson, Garneaux picked up Eagle Thunder and Harold Jones. Shortly after midnight, Bureau of Indian Affairs (BIA) police officer, William Hawk, stopped the vehicle in Fort Thompson. Garneaux, the driver of the vehicle, told Hawk that he was taking his grandchildren back to Lower Brule. Because Garneaux did not have a valid driver's license, Jones then drove the vehicle. Approximately twenty minutes later, BIA police officer, Victor Ziegler, stopped the vehicle at another location in Fort Thompson to follow up on a report from Madeline Pomani that Eagle Thunder had stolen a half gallon of wine from her. Ziegler asked the men why the children were out so late. Jones and Garneaux told Ziegler that the children were Garneaux's grandchildren. Ziegler then directed Jones to take the children home and allowed the men to leave in the vehicle. VLG testified that she was scared to say anything to Hawk or Ziegler for fear that the officers would take her to jail for drinking and violating curfew.

The men proceeded from Fort Thompson west across the Missouri River to the Lower Brule reservation. During this portion of the trip, Jones testified that he asked Eagle Thunder to drive. VLG, however, testified that Garneaux took over the driving and that she asked him several times to take her home but he refused. She further testified that everyone in the vehicle had been drinking beer and that Eagle Thunder had offered her something to drink out of a green bottle. VLG first stated she drank out of the bottle, but later said she refused. She testified that the drinking made her feel dizzy and tired and that she fell asleep.

VLG woke up while the vehicle was parked at the Iron Nation boat ramp. VLG got out of the vehicle and, after doing so, was grabbed by Garneaux and knocked to the ground. While on the ground, Eagle Thunder ripped her jeans down the side and placed his hand over her mouth to prevent her from screaming at another vehicle that was going by. VLG testified that Eagle Thunder then got on top of her, touched his

"sex organ" to her "sex organ" and that it hurt. When Eagle Thunder finally got off of her, VLG got up and told Jones that Eagle Thunder had raped her. Jones, after hearing this, hit Eagle Thunder.

JTL testified that he had fallen asleep while riding around in the vehicle but awoke to hear VLG screaming. He went on to testify that he saw an old and younger man on top of VLG.[2] He also testified that he saw the old man hit VLG with a belt and saw a third man strike Eagle Thunder after VLG got back in the vehicle.

JTL was later seen by Dr. Mary Carole Curran, a clinical psychologist who specializes in child sexual abuse cases. JTL demonstrated to Curran, through the use of anatomically correct dolls, that VLG had been raped by Garneaux initially and then by Eagle Thunder.

VLG was also seen by Curran. At trial, Curran testified about what VLG had told her during an interview and what VLG had demonstrated using the anatomically correct dolls. In essence, VLG told Curran that Eagle Thunder dragged her from the vehicle, threw her to the ground, put his hand over her mouth and nose so she could "hardly breathe", pulled her pants off and raped her. When Curran asked her how it felt, VLG said that it was sharp and hurt a lot and that she cried.

Jones, who had been asleep in the vehicle, testified that he remembered seeing VLG sitting on the side of the vehicle crying. When he asked her what was wrong, VLG answered, "[t]hey raped me." Jones helped VLG to the back seat of the vehicle. He then went up to Eagle Thunder and said, "[w]hat did you have to do that for ... she is just a little girl", and proceeded to strike Eagle Thunder.

Thereafter, Garneaux drove Eagle Thunder, Jones, VLG and JTL to the home of Elizabeth Quilt, who is Eagle Thunder's mother. There, VLG showed Quilt her ripped pants and told her what happened. Quilt asked Eagle Thunder, "[h]ow come you did that, you know you are related to her." After changing her pants in the bathroom, VLG fell on the floor and passed out. She awoke later on the couch in the home, feeling dizzy and sick.

Quilt called the Tribal Police Department in Lower Brule and reported that VLG was at Quilt's house. Officer Monty Lebeau drove to Quilt's house where he found VLG passed out on the living room couch. Quilt gave Lebeau VLG's ripped pants which he took into evidence. Lebeau observed VLG to be unsteady on her feet and he could smell alcohol on her person. She appeared to Lebeau to be intoxicated. Lebeau and another officer assisted VLG out of the house to the patrol car. During this process, VLG held tightly on to Lebeau and seemed withdrawn and scared. As the officers were turning out of Quilt's driveway, Garneaux was turning into the driveway. Garneaux had Eagle Thunder, Jensen Big Eagle and JTL with him in the vehicle. The officers immediately stopped the Garneaux vehicle, took JTL out and placed him in the patrol car. As Lebeau was placing JTL into the back seat of the patrol car, the boy told Lebeau that Garneaux "did something nasty to [VLG]." Based upon what Quilt had told him and what he had observed, Lebeau placed Garneaux, Eagle Thunder and Jones under arrest.

VLG was taken to the Lower Brule Police Department, and then taken by ambulance to a hospital in Chamberlain, South Dakota. VLG arrived at the hospital emergency room at approximately 8:00 o'clock, a.m. on July 23rd. There, VLG was first seen by Mary Pat Mueller of the South Dakota Department of Social Services. Mueller interviewed VLG with her mother present. Mueller stayed with VLG while Dr. Jerry Van Ert conducted a rape kit examination. Mueller took photographs during the rape examination.

Van Ert's examination produced evidence that VLG had been raped. Specifically, Van Ert found a bruise on VLG's right arm that was several hours old and consistent with a grip. He likewise found two tears in the

---

**2.** The record reveals that at the time of the kidnapping and rape incident, Eagle Thunder was 29 years old and Garneaux was 60 years old.

vaginal area that were also several hours old and were consistent with penetration by an erect penis. Although no evidence of spermatozoa were observed in the swabs taken from VLG's vaginal vault, Van Ert testified that as long as there was no ejaculation, spermatozoa would not necessarily be found in a female's vaginal vault.

During cross examination, defense counsel attempted to ask Van Ert questions concerning an old tear of VLG's hymenal ring. Van Ert's report stated that in addition to the other injuries that were noted, he found a tear in the hymenal ring which did not appear to be a recent tear. The Government objected to defense counsel's inquiring into the hymenal ring tear and the District Court sustained the objection pursuant to Rules 412 and 403 of the Federal Rules of Evidence.

On another evidentiary matter, the Government sought to admit evidence that in 1973, Garneaux raped a six-year-old girl on the Rosebud Indian Reservation. The District Court allowed the evidence and Beverly Never Misses a Shot and her mother testified at trial about how Garneaux had taken Never Misses a Shot (then six years old) out of a car and into a field where he raped her. Garneaux was convicted and sentenced to prison for raping Never Misses a Shot, and remained there until a month before VLG's abduction and rape.

Prior to the testimony of Never Misses a Shot and her mother, an in-chambers hearing was held before the District Court. The Court, after considering the Government's offer of proof and hearing arguments from counsel, concluded that the evidence was admissible under Fed.R.Evid. 404(b) and 403. The Court, however, gave cautionary instructions immediately after the testimony of Never Misses a Shot and her mother, and reiterated the same admonitions in its final instructions. During the in-chambers hearing, counsel for Eagle Thunder voiced a concern about the limiting instruction the Court planned to give, saying, "[w]ill the instruction then clearly state, I want to make sure my client is clearly ruled out in that instruction." A discussion then ensued about whether the cautionary instruction should specifically refer to Eagle Thunder. The Court eventually

decided that the instruction would not name Eagle Thunder.

Eagle Thunder filed a pre-trial motion and supporting affidavit for severance. The affidavit alleged that Garneaux had made a statement to the FBI implicating Eagle Thunder, that the defenses for both Eagle Thunder and Garneaux were adverse to each other because each one was expected to blame the other for the sexual assault, and that Garneaux had an extensive criminal record involving similar charges with young children which could be used against him and, as a result, be prejudicial to Eagle Thunder because it was expected that Garneaux would testify. In response to the motion, the Government represented to the District Court that it did not intend to use Garneaux's statement (and the same was not used at trial) so that any concern and/or prejudice was removed. The Court ultimately denied the severance motion and neither defendant testified at trial.

Additional facts, where necessary, will be recited with each of the issues raised below.

## DISCUSSION

### I. Evidentiary Hearing.

Eagle Thunder requests that the Court hold an evidentiary hearing in this case. An evidentiary hearing, however, need not be held if the "facts alleged, taken as true, would not justify relief." *Larson v. United States,* 905 F.2d 218, 220–21 (8th Cir.1990); *United States v. Kraemer,* 810 F.2d 173, 178 (8th Cir.1987) (per curiam). Likewise, an evidentiary hearing is not required "where the files and records of the case conclusively show that the petitioner is not entitled to relief." *United States v. Schmitz,* 887 F.2d 843, 844 (8th Cir.1989) (citations omitted); *United States v. Lambros,* 614 F.2d 179, 181 (8th Cir.1980) (citations omitted). Each of the claims Eagle Thunder presents in support of his § 2255 motion is capable of resolution from the record. *See Rogers v. United States,* 1 F.3d 697, 699 (8th Cir.1993); *United States v. Raddatz,* 447 U.S. 667, 674, 100 S.Ct. 2406, 2411–12, 65 L.Ed.2d 424 (1980). My review of the record convinces me that Eagle Thunder is not entitled to relief. *See*

*Cheek v. United States,* 858 F.2d 1330, 1333 (8th Cir.1988).

## II. Admission of Garneaux's Prior Rape.

Eagle Thunder claims in "Ground One" of his Amended Motion that he was denied a fair trial because the District Court allowed the Government to introduce evidence of Garneaux's 1973 rape of Never Misses a Shot. The rape incident, although fifteen years old, occurred under circumstances similar to the rape of VLG. Garneaux was convicted of the rape offense and imprisoned for it. Prior to ruling on the admissibility of this evidence, the Court held a hearing in chambers and, after doing so, concluded that the evidence was admissible under Fed. R.Evid. 404(b) and 403. Immediately following the admission of the evidence, the Court gave limiting instructions and, ultimately, final instructions admonishing the jury to only consider the evidence for the purpose of determining the "opportunity, intent, preparation, plan or knowledge" of Garneaux to commit the two Aggravated Sexual Abuse charges (Cts. IV and V of the Indictment). No reference was made to Eagle Thunder in either the evidence itself or in the Court's instructions regarding the evidence. The jury acquitted Garneaux of both of the Sexual Abuse charges.

■ Eagle Thunder's claim was passed on and rejected by the Eighth Circuit. On appeal, Eagle Thunder argued that the District Court erred in denying his motion to sever his trial from that of Garneaux, asserting that the introduction of the fifteen-year-old rape conviction "unduly prejudiced him." *United States v. Eagle Thunder,* 893 F.2d at 953. Although the Eighth Circuit believed that the claim had not been properly preserved for review, it nonetheless went on to conclude that Eagle Thunder had consented to the admission of the evidence and, in any event, the introduction of the evidence did not prejudice him. *Id.* Having unsuccessfully raised this claim on direct appeal, Eagle Thunder cannot now seek to relitigate the claim on a motion to vacate pursuant to 28 U.S.C. § 2255. *Dall v. United States,* 957 F.2d 571, 572 (8th Cir.1992); *United States v.*

*Shabazz,* 657 F.2d 189, 190 (8th Cir.1981) (per curiam); *see also United States v. Kraemer,* 810 F.2d at 177; *Shaw v. United States,* 812 F.Supp. 154, 157–59 (D.S.D.1993). Although it can be argued that Eagle Thunder's claim was not presented to the Eighth Circuit in the same manner and context it is now being asserted, nonetheless, I believe that the Eighth Circuit's lack of prejudice finding is dispositive of the issue and, in and of itself, defeats the claim.

■ If, however, it can be successfully argued that Eagle Thunder's claim was not raised and decided on direct appeal, then Eagle Thunder has procedurally defaulted the claim and is barred from having it reviewed under § 2255.

■ The Supreme Court has observed that "a collateral challenge may not do service for an appeal." *United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982). "[N]ormally, a collateral attack should not be entertained if defendant failed, for no good reason, to use another available avenue of relief." *Poor Thunder v. United States,* 810 F.2d 817, 823 (8th Cir. 1987) (citing *Kaufman v. United States,* 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969)). § 2255 relief is not available to correct errors which could have been raised at trial or on direct appeal, absent a showing of both "cause" excusing defendant's procedural default and "actual prejudice" resulting from the errors of which he complains, *Reid v. United States,* 976 F.2d 446, 448 (8th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1351, 122 L.Ed.2d 732 (1993), (*citing Frady,* 456 U.S. at 168, 102 S.Ct. at 1594–95) or, alternatively, a showing that the alleged errors were fundamental defects which resulted in a complete miscarriage of justice. *See United States v. Smith,* 843 F.2d 1148 (8th Cir.1988) (per curiam); *see also United States v. Wilson,* 997 F.2d 429, 431 (8th Cir.1993). The miscarriage-of-justice exception allows for a review of cases where a constitutional violation has probably resulted in the conviction of a defendant who is actually innocent. *Sawyer v. Whitley,* —— U.S.

——, ———————, nn. 5 & 6, 112 S.Ct. 2514, 2518–19, nn. 5 & 6, 120 L.Ed.2d 269 (1992).[3]

Eagle Thunder offers no "cause" for his procedural default and I can find none. Significantly, he does not contend that he received ineffective assistance of counsel from his appellate counsel[4] or seek to use such a contention to establish "cause" for his procedural default. *See Reid v. United States*, 976 F.2d at 448; *Ford v. United States*, 983 F.2d 897, 898–99 (8th Cir.1993). He also has made no showing of factual innocence. *See Narcisse v. Dahm*, 9 F.3d at 40 & n. 2.

Having failed to establish the requisite "cause" to excuse his procedural default, and having failed to make a proper showing of factual innocence, I find that Eagle Thunder's claim is barred by *Frady*, 456 U.S. 152, 102 S.Ct. 1584 and *Reid*, 976 F.2d 446. *See also, Ramey v. United States*, 8 F.3d 1313 (8th Cir.1993). In addition, I find that based on the Eighth Circuit's conclusion that Eagle Thunder was not prejudiced by the introduction of the 1973 rape incident, *Eagle Thunder*, 893 F.2d at 953, Eagle Thunder did not suffer "actual prejudice" so as to overcome any procedural default that may have existed.

▌ In any event, even assuming, *arguendo*, that Eagle Thunder's claim is not foreclosed by the Eighth Circuit's decision and is not procedurally barred from review under *Frady* and *Reid*, he is still not entitled to relief. Although the prior rape incident appears to have been erroneously admitted into evidence, *see United States v. Has No Horse*, 11 F.3d 104, 105–07 (8th Cir.1993); *United States v. Fawbush*, 900 F.2d 150, 151–52 (8th Cir.1990), the error was nonetheless harmless and did not have a substantial and injurious effect or influence on the verdict returned against Eagle Thunder or "actually

prejudice" him. *Brecht v. Abrahamson*, —— U.S. ——, ———————, 113 S.Ct. 1710, 1716–22, 123 L.Ed.2d 353 (1993); *United States v. Garbett*, 867 F.2d 1132, 1135 (8th Cir.1989); *see also, Lufkins v. Leapley*, 965 F.2d 1477, 1480–84 (8th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 271, 121 L.Ed.2d 200 (1992). To be admissible, other crimes evidence must be relevant to a material issue, similar in kind and reasonably close in time to the crimes charged, proved by a preponderance of the evidence and its probative value must not be outweighed by its prejudicial impact. *United States v. Has No Horse*, 11 F.3d at 106–07; *see also Huddleston v. United States*, 485 U.S. 681, 685–92, 108 S.Ct. 1496, 1499–1502, 99 L.Ed.2d 771 (1988); *United States v. Fawbush*, 900 F.2d at 151. In the present case, I do not believe that the admission of Garneaux's rape of Never Misses a Shot served any of the purposes permissible under Fed.R.Evid. 404(b). While the rape incident may arguably be relevant to Garneaux's credibility and to show his opportunity, intent, preparation, plan or knowledge,[5] it occurred fifteen years before the crimes for which he was charged and, more importantly, it appears to establish nothing more than a propensity on his part to rape and sexually abuse children. Rule 404(b) and Eighth Circuit precedent flatly prohibit the admission of other crimes evidence under these circumstances. *Has No Horse*, 11 F.3d at 106–07; *Fawbush*, 900 F.2d at 151–52.

Despite this, any prejudicial impact to Eagle Thunder, resulting from the admission of the rape incident, was not substantial enough to warrant granting him a new trial. *See United States v. Eagle Thunder*, 893 F.2d at 953. The District Court twice instructed the jury to consider the incident solely against Garneaux and only for certain limited pur-

---

3. Whether the fundamental miscarriage of justice exception enunciated in *Sawyer* is even applicable in non-capital cases appears to be an open question in this circuit. *See Narcisse v. Dahm*, 9 F.3d 38, 40, n. 2 (8th Cir.1993).

4. Eagle Thunder was represented by different counsel on appeal than he had at trial.

5. "Knowledge" is an essential element of 18 U.S.C. §§ 2241(a) and 2241(c) and one of the specific grounds upon which Fed.R.Evid. 404(b)

permits the introduction of other crimes evidence. *See United States v. Calloway*, 938 F.2d 907, 910–11 (8th Cir.1991); *United States v. Estabrook*, 774 F.2d 284, 287–89 (8th Cir.1985).

The rape incident also may arguably be relevant to show Garneaux's passion or propensity for unusual and abnormal sexual relations with pre-pubescent children or to establish his *modus operandi* to abduct and rape young children. *See generally, McCormick on Evidence*, § 190 (4th Ed.1992).

poses. By doing so, the Court minimized any risk that the jury would improperly infer a criminal predisposition on *Eagle Thunder's* part to sexually abuse young children. The verdicts returned plainly demonstrate that the jury was able to follow the Court's instructions and to compartmentalize the evidence. The record is devoid of any evidence whatsoever that shows or even suggests that the jury relied on or reacted to the rape incident in convicting Eagle Thunder of the Aggravated Sexual Abuse offenses. I thus cannot conclude that the admission of the rape incident was so unduly prejudicial that it deprived Eagle Thunder of a fair trial. Accordingly, Eagle Thunder's claim, as alleged in Ground One of his Amended Motion, must be denied.

### III. Other Acts Evidence.

In "Ground Two" of his Amended Motion, Eagle Thunder contends that certain "other act" evidence involving himself, and to a lesser extent Garneaux, was improperly admitted into evidence at trial. In making this contention, Eagle Thunder relies on specific portions of testimony given at trial by three tribal officers, which he claims was offered as "other crimes" evidence [6] and singularly or in combination with the admission of Garneaux's prior rape conviction evidence, constituted prejudicial error. Proper evaluation of Eagle Thunder's contention requires review of both the context in which the testimony assailed was given and the purpose for which it was received.

The evidence at trial established that VLG and JTL got into Garneaux's vehicle for a leisurely ride in the West Brule Housing Area after Garneaux agreed to have VLG home by 10 o'clock, p.m. Police Officer Robert Traversie was off duty visiting a friend nearby and observed VLG and JTL get into Garneaux's vehicle. Traversie testified that he knew the vehicle was owned by Garneaux. When asked how he knew this, Traversie responded, "[w]e have had prior incidents on that same vehicle".

Subsequently, Garneaux drove the vehicle across the Missouri River to the community

of Fort Thompson, where he picked up Eagle Thunder and Jones. While in Fort Thompson, a police officer stopped the vehicle on at least two occasions. The vehicle was first stopped by Officer William Hawk based on a report he received that the vehicle "was driving all over the road." Hawk then located the vehicle, stopped it and identified the driver as being Garneaux. Hawk testified that he recognized Eagle Thunder and Jones in the car, who he knew from "previous arrests." While talking to Garneaux, Hawk observed two children in the vehicle. Garneaux told Hawk that the children were his grandchildren and that he was taking them back to Lower Brule. After a fellow officer had checked Jones' drivers license and confirmed that Jones would now be driving, Hawk allowed the vehicle to leave.

A short time later, Madeline Pomani flagged down Police Lieutenant Victor Ziegler and "reported" to him that Eagle Thunder had stolen a half-gallon of wine from her. Pomani told Ziegler that Eagle Thunder was in a vehicle and gave Ziegler a brief description of the vehicle. Ziegler found the vehicle parked behind some old-age housing units and, because he was looking for Eagle Thunder who was reportedly in the vehicle, went up to the vehicle. There, Ziegler questioned Eagle Thunder about Pomani's complaint. Ziegler also asked about the two children in the vehicle and was informed by Garneaux that they were his grandchildren. Ziegler then told Jones, who was still driving the vehicle, to take the children home and permitted Jones to drive the vehicle away.

■ Eagle Thunder did not raise on direct appeal the evidentiary claim he now makes and has failed to allege and offer proof of any "cause" for this procedural default. Because of this and because the defaulted claim does not rise to the level of a "fundamental defect" resulting in a complete "miscarriage of justice", Eagle Thunder's "other crimes" claim is procedurally barred from review under § 2255. *Ante* at 1372–1373.

■ If, however, Eagle Thunder's claim is found to be reviewable, he cannot

---

**6.** Although referred to as "other crimes" evidence by Eagle Thunder, the evidence in reality

involves "other bad acts" and not necessarily convictions or even crimes.

prevail on the merits of the same. Indeed, the Eighth Circuit has held that where evidence of other bad acts or crimes is "so blended or connected, with the one[s] on trial as that proof of one incidentally involves the other[s]; or explains the circumstances thereof; or tends logically to prove any element of the crime charged", *United States v. Bass*, 794 F.2d 1305, 1312 (8th Cir.) *cert. denied*, 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986), it is admissible as an integral part of the immediate context of the crime[s] charged. *Id. See also, United States v. Waloke*, 962 F.2d 824, 828 (8th Cir.1992); *United States v. Bettelyoun*, 892 F.2d 744, 746–47 (8th Cir.1989); *United States v. Ball*, 868 F.2d 984, 988 (8th Cir. 1989). When the other bad act or crimes evidence is so integrated, it is not extrinsic and therefore is not governed by Fed.R.Evid. 404(b). *United States v. Bettelyoun*, 892 F.2d at 746; *United States v. Bass*, 794 F.2d at 1312; *United States v. DeLuna*, 763 F.2d 897, 913 (8th Cir.) *cert. denied*, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). The Eighth Circuit has also held that "evidence which is probative of a crime with which a defendant is charged, and not *solely* of some other uncharged crimes, is not evidence of 'other bad acts'". *United States v. Westbrook*, 896 F.2d 330, 334 (8th Cir.1990); *United States v. Cerone*, 830 F.2d 938, 948 (8th Cir.1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1730, 100 L.Ed.2d 194 (1988); *see also, United States v. DeLuna*, 763 F.2d at 913; *United States v. Caspers*, 736 F.2d 1246, 1249 (8th Cir.1984).

■ The fact that other act or crimes evidence is taken out of the scope of Rule 404(b) analysis does not remove all limits on the admission of such evidence. The dictates of Rule 403 must still be applied to ensure that the probative value of such evidence is not outweighed by its prejudicial effect. *See Bass*, 794 F.2d at 1312.

In the instant case, most, if not all of the other bad act or crimes evidence arises from Eagle Thunder's assertions that Traversie, Hawk and Ziegler's testimony pertaining to prior arrest incidents, arrests and reports was inadmissible "other crimes" evidence. The testimony, however, established why the officers stopped the vehicle and how they were able to identify both the vehicle and its occupants. *See United States v. Oakie*, 12 F.3d 1436, 1441–42 (8th Cir.1993) (testimony that a co-defendant "had some old warrants on him" held admissible to explain the circumstances of the charged offense); *United States v. Schrader*, 10 F.3d 1345, 1351 (8th Cir.1993) (other acts evidence admissible to explain the circumstances surrounding the crime[s] charged); *see also, United States v. Savage*, 863 F.2d 595, 599 (8th Cir.1988) (such evidence is admissible to explain the circumstances surrounding the investigation and arrest of a defendant); *cert. denied*, 490 U.S. 1082, 109 S.Ct. 2105, 104 L.Ed.2d 666 (1989); *United States v. Moore*, 735 F.2d 289, 292 (8th Cir.1984) (same). The evidence also showed that VLG and JTL were in the vehicle and showed how the occupants explained their presence. *Id.* Traversie's statement about having had prior "incidents with the vehicle" related to contact with Garneaux, the owner of the vehicle, and helped demonstrate to the jury how he was able to identify the vehicle as being Garneaux's. Hawk's comment that he knew Jones and Eagle Thunder from "previous arrests" was an answer not solicited by the Government and non-responsive to the question he was asked. It is not clear from Hawk's answer who (i.e., Jones, Eagle Thunder or both) Hawk knew from previous arrests. In any event, the answer did provide a basis for the identification of Jones and Eagle Thunder. Ziegler's remarks about Pomani's "report" served nothing more than to explain why he approached the vehicle and talked to Eagle Thunder. Later in the trial, when Pomani was called as a witness, the jury was made aware of Pomani's report that Eagle Thunder had stolen her half-gallon of wine. Moreover, VLG and JTL testified that they were given wine to drink in a green bottle, and that a half-gallon of wine was later found in the vehicle.

The evidence at issue here was relevant to and probative of one or more of the crimes charged and, therefore, cannot be considered extrinsic evidence so as to implicate the strictures of Rule 404(b). *Id.* In addition, the evidence, on balance, was more probative that prejudicial or, at the very least, its

probative value was not *substantially* outweighed by its prejudicial effect.

For one or both of the two reasons advanced above, Eagle Thunder's other bad act/crimes claim (Ground Two of his Amended Motion) must fail.

## IV. Hearsay Testimony of Social Worker and Psychologist.

In "Ground Three" of his Amended Motion, Eagle Thunder asserts that his rights under the Confrontation Clause of the United States Constitution were violated by the admission of certain hearsay testimony of social worker Mary Pat Mueller and clinical psychologist Dr. Mary Carole Curran. For the reasons more specifically discussed below, this testimony was properly received under the provisions of Fed.R.Evid. §§ 803(4) and 803(24) and did not violate Eagle Thunder's rights under the Confrontation Clause.

Prior to trial, the Government gave notice pursuant to Fed.R.Evid. §§ 803(4), 803(24) and 804(5), of its intent to offer the hearsay statements of VLG and JTL made to Mueller and Curran. Eagle Thunder objected to the Government's use of the hearsay testimony and filed a written objection to the notice along with memorandum of law, detailing his arguments and authorities. The District Court overruled the objection and allowed Mueller and Curran to testify about what VLG and JTL told them.

Mueller, a social worker and former therapist, has had substantial experience in dealing with abused and neglected children and adult and child victims of sexual abuse. She interviewed VLG in an examining room at the hospital in Chamberlain. According to Mueller, the interview was conducted for "therapeutic reasons" to protect VLG's physical and emotional well-being. VLG's mother was present for part of the interview. During the interview, VLG recounted and described in detail the rape incident, as well as the events surrounding it. After the interview, Mueller took photographs of VLG during the rape examination performed by Dr. Van Ert. VLG was then taken home and subsequently referred by Mueller to Curran.

Curran, a clinical psychologist with extensive credentials and experience with victims of sexual abuse, saw VLG and JTL for evaluation and therapy. Curran testified at great length about her interview of and therapy with VLG and JTL. The children recounted to her the events before and after the rape incident itself.

█ The admission of Curran's testimony did not violate Eagle Thunder's Sixth Amendment right to confront witnesses against him. In *United States v. Spotted War Bonnet*, 933 F.2d 1471 (8th Cir.1991), *cert. denied*, 502 U.S. 1101, 112 S.Ct. 1187, 117 L.Ed.2d 429 (1992) the Eighth Circuit addressed a similar Confrontation Clause claim and stated that, "[t]he Clause is satisfied when the hearsay declarant, here the alleged child victims, actually appear in court and testify in person." *Id.* at 1473; *see also, United States v. Grooms*, 978 F.2d 425, 428 (8th Cir.1992); *United States v. Balfany*, 965 F.2d 575, 580 (8th Cir.1992). Here, VLG and JTL appeared in court and testified in person. Both children were subject to meaningful cross-examination thereby obviating any potential for violation of the Confrontation Clause. *Grooms*, 978 F.2d at 428; *Balfany*, 965 F.2d at 580; *Spotted War Bonnet*, 933 F.2d at 1473–74; *see also, White v. Illinois*, 502 U.S. 346, 354–56 & n. 8, 112 S.Ct. 736, 742–43 & n. 8, 116 L.Ed.2d 848 (1992).[7]

█ In addition, the testimony of Mueller and Curran was not violative of Confrontation Clause strictures because it fell within "a firmly established exception" to the hearsay rule. Both the Supreme Court and the Eighth Circuit have held that the hearsay exception for medical diagnosis and treatment is a firmly rooted exception for Con-

---

7. *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) and *Ring v. Erickson*, 983 F.2d 818 (8th Cir.1992) do not control this case. Unlike in *Wright* and *Ring*, VLG and JTL testified and were subject to extensive cross-examination. In *Spotted War Bonnet*, the Eighth Circuit observed that the holding in *Wright* did not apply where the out-of-court declarants, the alleged child victims, did not testify. 933 F.2d at 1475. The Eighth Circuit has continued to make this distinction in rejecting similar Confrontation Clause arguments. *See Grooms*, 978 F.2d at 428; *Balfany*, 965 F.2d at 580–81.

frontation Clause purposes. *Balfany,* 965 F.2d at 579–81; *United States v. Shaw,* 824 F.2d 601, 608 (8th Cir.1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1033, 98 L.Ed.2d 997 (1988); *United States v. Renville,* 779 F.2d 430, 438 (8th Cir.1985); *see also, White v. Illinois,* 502 U.S. at 356–60, 112 S.Ct. at 743–44. These Courts have also made it clear that "statements made about abuse, including the identity of the abuser, made by a child to a trained social worker or psychologist pursuant to diagnosis or treatment for emotional or psychological injuries are admissible under Rule 803(4)." *United States v. Whitted,* 11 F.3d 782, 786–87 (8th Cir.1993); *Balfany,* 965 F.2d at 581; *United States v. Provost,* 875 F.2d 172, 177 (8th Cir.), *cert. denied,* 493 U.S. 859, 110 S.Ct. 170, 107 L.Ed.2d 127 (1989); *United States v. DeNoyer,* 811 F.2d 436, 438 (8th Cir.1987); *see also White,* 502 U.S. at 356–60, 112 S.Ct. at 743–44. Mueller is a trained social worker and Curran is a trained psychologist. Mueller testified that the information provided by VLG was utilized for purposes of diagnosis and treatment, on a therapeutic basis, of VLG's physical and emotional well-being. Similarly, Curran explained that the information she acquired from VLG and JTL was pertinent to her psychological diagnosis and treatment of the children. VLG's statements to Mueller and the statements of both VLG and JTL to Curran, therefore, were admissible under Rule 803(4).[8] *Compare, United States v. White,* 11 F.3d 1446, 1449–50 (8th Cir.1993).

■■■ Furthermore, based on the totality of the circumstances that surround the making of these statements, VLG and JTL were worthy of belief and their statements were sufficiently reliable and trustworthy to be able to withstand scrutiny under the Confrontation Clause. *Idaho v. Wright,* 497 U.S. 805, 816, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638 (1990); *citing Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); *Grooms,* 978 F.2d at 426–28; *McCafferty v. Leapley,* 944 F.2d 445, 451–52 (8th Cir.1991), *cert. denied,* 503 U.S. 911, 112 S.Ct. 1277, 117 L.Ed.2d 503 (1992). VLG's statements were made to Mueller several hours after the rape incident and at least in part with the child's mother present. VLG was interviewed by a social worker who had specialized training and experience in dealing with child victims of sexual abuse. Curran conducted her interviews of VLG and JTL in a careful and deliberate manner so as not to lead the children. VLG and JTL were 12 and 9, respectively, at the time of trial, and were extensively cross-examined. The jury thus could weigh their statements to Mueller and Curran and accord the statements whatever weight it deemed appropriate. On this record, I cannot conclude that the hearsay statements lacked the requisite "indicia of reliability" to be excludable under the Confrontation Clause. This being the case, the District Court did not abuse its discretion in admitting these statements pursuant to Rule 803(24). *Grooms,* 978 F.2d at 427–28; *Balfany,* 965 at 581; *McCafferty,* 944 F.2d at 451–52; *United States v. Dorian,* 803 F.2d 1439, 1443–47 (8th Cir.1986).[9]

## V. Newly Discovered Evidence.

■■■ Eagle Thunder asserts in "Ground Four" of his Amended Motion that he is entitled to relief based on certain newly discovered evidence. In support of his asser-

---

8. Mueller & Curran's testimony likewise did not violate Fed.R.Evid. 702 or rise to the level of improper vouching as was the case in *United States v. Whitted,* 11 F.3d at 785–87.

9. The Government argues that Eagle Thunder "waived" his Confrontation Clause claim by failing to raise the same in his direct appeal to the Eighth Circuit. The record reveals that such a claim was not presented to or decided by the Eighth Circuit on appeal. In response, Eagle Thunder argues that "cause" excusing his waiver or procedural default existed. Specifically, Eagle Thunder asserts that *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139 and *Ring v. Erickson,*

983 F.2d 818 constituted "new" case law which modified or at least clarified pre-existing decisional law in this circuit. *Wright* does appear at odds with a number of Eighth Circuit cases decided prior to June, 1990, *see Spotted War Bonnet,* 933 F.2d at 1473, and for this reason may arguably be sufficiently novel to satisfy the "cause" requirement of *Frady,* 456 U.S. 152, 102 S.Ct. 1584 and *Reid,* 976 F.2d 446. Because this appears to be a rather close and debatable question, it seems more prudent, and perhaps easier, to simply decide the merits of Eagle Thunder's claim. In doing so, I express no opinion as to whether all or a portion of Eagle Thunder's claim is procedurally barred by *Frady* and *Reid.*

tion, Eagle Thunder relies on the hearsay statements of Garneaux, who allegedly told Bruce Withorn while in prison that he had "had" [sexual intercourse with] VLG and her mother. The proffered evidence is submitted in the form of an affidavit of counsel who spoke to Eagle Thunder's brother, William Eagle Thunder, who claims to have spoken to Withorn who, in turn, claimed that Garneaux "bragged" about this.

Eagle Thunder's newly discovered evidence assertion cannot be used as a basis to obtain relief under 28 U.S.C. § 2255. The Supreme Court and the Eighth Circuit have consistently held that a claim of newly discovered evidence relevant only to guilt is generally not a ground for habeas relief. To justify granting a prisoner relief, such evidence must bear upon the constitutionality of the prisoner's detention; the existence merely of newly discovered evidence relevant to a prisoner's guilt is not a ground for federal habeas corpus relief. *Herrera v. Collins,* —— U.S. ——, —— – ——, 113 S.Ct. 853, 860–61, 122 L.Ed.2d 203 (1993); *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963); *United States v. Spector,* 888 F.2d 583, 585 (8th Cir.1989); *Walker v. Lockhart,* 763 F.2d 942, 960 (8th Cir.1985) (en banc), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3332, 92 L.Ed.2d 738 (1986); *Drake v. Wyrick,* 640 F.2d 912, 913 (8th Cir.1981).

Here, Eagle Thunder's proffered evidence has to do only with his guilt. Nowhere does he allege or argue that the evidence bears upon the constitutionality of his detention. Thus, even if I assume that Garneaux's statement is credible and that the same would be admissible at a new trial, the statement does not provide a ground for habeas relief under applicable Supreme Court and Eighth Circuit precedent. *Id.*

In any event, the hearsay statement, if believed by a jury, would probably not produce an acquittal on retrial and for this reason it cannot serve as a basis for granting Eagle Thunder relief under § 2255. *English v. United States,* 998 F.2d 609, 611–12 (8th Cir.) *cert. denied,* —— U.S. ——, 114 S.Ct. 573, 126 L.Ed.2d 472 (1993); *Garcia v. Powers,* 973 F.2d 684, 686 (8th Cir.1992); *Dumond v. Lockhart,* 911 F.2d 104, 107 (8th

Cir.1990); *Larson v. United States,* 905 F.2d at 221. Viewing the evidence in a light most favorable to the prosecution, a reasonable jury could have easily concluded that Eagle Thunder raped VLG.

Both Eagle Thunder and Garneaux were charged in the indictment with separate counts of Aggravated Sexual Abuse. The Government attempted to prove at trial that both men had intercourse with VLG. JTL testified that he saw both Eagle Thunder and Garneaux on top of VLG and that he heard VLG screaming while this took place. VLG testified that Garneaux grabbed her and threw her down beside the vehicle and that she then passed out for a short period of time. When she came to, Eagle Thunder was on top of her and touched her sex organ with his. Jones testified that although he was passed out in the vehicle while the rape occurred, when he came to, he heard VLG crying. He also testified that when he asked VLG what was wrong, she said, "*[t]hey raped me*".

The record indicates that the jury had sufficient evidence to convict Garneaux of the sexual abuse charges alleged in the indictment. The evidence against Garneaux on these charges was not as strong as it was against Eagle Thunder because VLG could not specifically recall Garneaux raping her. VLG's inability to identify Garneaux as one of her rapists in all probability created reasonable doubt in the jurors' minds about Garneaux's guilt on the sexual abuse charges. The fact that Eagle Thunder is now able to produce evidence that makes it more likely Garneaux raped VLG does not at the same time dilute the direct evidence of Eagle Thunder's involvement. Indeed, both VLG and JTL testified that Eagle Thunder forced himself on VLG and raped her. It is thus far from clear that Garneaux's after-the-fact statement, when viewed in the context of the Government's evidence inculpating Eagle Thunder, would produce an acquittal at a new trial. *Id.* Accordingly, Eagle Thunder is not entitled to relief under § 2255 based on newly discovered evidence.

## VI. Severance.

Eagle Thunder next argues, in "Ground Five" of his Amended Motion, that the Dis-

trict Court's refusal to sever his joint trial from Garneaux deprived him of his constitutional rights to testify himself and to call witnesses on his own behalf. The record demonstrates that Eagle Thunder's severance motion was properly denied and that his constitutional rights were not violated.

Prior to trial, Eagle Thunder's counsel filed a motion for a separate trial on Count I of the indictment (the Kidnapping charge) and a motion for severance on the basis of prejudicial joinder. His counsel also filed affidavits and a memorandum in support of the motions. In the affidavits and memorandum, Eagle Thunder's counsel represented to the Court that Eagle Thunder and Garneaux had antagonistic defenses and that Eagle Thunder would testify if granted a separate trial. The District Court denied both motions in a written order.

■ After his conviction, Eagle Thunder retained different counsel to represent him on appeal. A review of the statement of legal issues taken from Eagle Thunder's appellate brief, a portion of the brief itself as well as the Eighth Circuit's opinion and judgment, reveals that the issue of severance based on prejudicial joinder was raised and argued on appeal.

The Eighth Circuit concluded that the District Court did not err in denying Eagle Thunder's severance motion. The Appeals Court observed that Eagle Thunder probably did not preserve the severance issue but went on to hold that he suffered no prejudice from the District Court's refusal to sever. In doing so, the Court pointed out that "[t]he fact that the jurors acquitted Garneaux of the sexual abuse charges demonstrates that the jurors 'in fact considered the evidence against each defendant separately' ". *United States v. Eagle Thunder*, 893 F.2d at 953–54, (*quoting United States v. Wagner*, 884 F.2d 1090, 1100 (8th Cir.1989), *cert. denied*, 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990)). It thus appears that the Eighth Circuit had before it and decided against Eagle Thunder the very same issue he presently claims entitles him to relief. Because this issue was decided on direct appeal, it cannot now be reconsidered. *Ante* at 1372; *see also Davis v. United States*, 417 U.S. 333, 342, 94 S.Ct. 2298, 2303, 41 L.Ed.2d 109 (1974).

■ If, for some reason, it is concluded that Eagle Thunder's severance claim is substantively distinct from the one raised on direct appeal or it is concluded that the Eighth Circuit never addressed or decided the constitutional component of the claim, Eagle Thunder nonetheless could have raised the claim on appeal and his failure or refusal to do so without the making of a "cause" or "factual innocence" showing constitutes procedural default and bars him from obtaining § 2255 relief under *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584 and *Reid v. United States*, 976 F.2d 446. *Ante* 1372.

In any event, Eagle Thunder is not entitled to § 2255 relief even based on the merits of his severance claim.

Fed.R.Crim.P. 8(b) provides that two defendants may be charged in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions." *See generally United States v. Lueth*, 807 F.2d 719, 730 (8th Cir.1986). The District Court may grant a motion for severance of defendants "[i]f it appears that a defendant * * * is prejudiced by a joinder. Fed.R.Crim.P. 14.

■ In general, persons who are jointly indicted on similar evidence from the same or related events should be tried together. *United States v. Adkins*, 842 F.2d 210, 211 (8th Cir.1988); *United States v. Wofford*, 562 F.2d 582, 585 (8th Cir.1977), *cert. denied*, 435 U.S. 916, 98 S.Ct. 1471, 55 L.Ed.2d 507 (1978). A district court's denial of a severance motion will not be disturbed in the absence of a showing that the court abused its discretion, causing clear or real prejudice to a defendant's right to a fair trial. *United States v. Oakie*, 12 F.3d at 1440–41; *United States v. Jagim*, 978 F.2d 1032, 1040 (8th Cir.1992); *cert. denied*, — U.S. —, 113 S.Ct. 2447, 124 L.Ed.2d 664 (1993); *United States v. McConnell*, 903 F.2d 566, 571 (8th Cir.1990), *cert. denied*, 498 U.S. 1106, 111 S.Ct. 1011, 112 L.Ed.2d 1093 (1991) (*quoting United States v. O'Meara*, 895 F.2d 1216, 1218–19 (8th Cir.) (citations omitted),

*cert. denied,* 498 U.S. 943, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990)). The question of whether the denial of a severance motion results in "clear or real prejudice" turns in large part on "whether the jury could compartmentalize the evidence against each defendant." *United States v. Foote,* 920 F.2d 1395, 1398 (8th Cir.1990), *cert. denied,* 500 U.S. 946, 111 S.Ct. 2246, 114 L.Ed.2d 487 (1991), (*quoting United States v. Nevils,* 897 F.2d 300, 305 (8th Cir.) (citation omitted), *cert. denied,* 498 U.S. 844, 111 S.Ct. 125, 112 L.Ed.2d 93 (1990)). An error involving misjoinder or severance requires reversal only if it resulted in "actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (*quoting Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *United States v. Kopelciw,* 815 F.2d 1235, 1237–38 (8th Cir.1987); *United States v. Lueth,* 807 F.2d at 730, n. 6. Although a defendant shoulders "a heavy burden" in showing that a denial of severance was reversible error, *see Kopelciw,* 815 F.2d at 1238 (*quoting United States v. Starr,* 584 F.2d 235, 238 (8th Cir. 1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1019, 59 L.Ed.2d 73 (1979)), proof that the defendant was denied the right to testify on his own behalf and call witnesses in his own defense and that the testimony would have been exculpatory, may be grounds for reversal. *United States v. Lyles,* 593 F.2d 182, 192 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). To obtain reversal on this ground, however, a defendant must demonstrate that severance would have cured the problem and that the testimony would be "substantially exculpatory". *Id.; United States v. Oakie,* 12 F.3d at 1440–41; *United States v. Jagim,* 978 F.2d at 1040; *United States v. McConnell,* 903 F.2d at 571; *United States v. DeLuna,* 763 F.2d at 920.

▮ In the instant case, the proffered testimony of Eagle Thunder and his mother, Elizabeth Quilt, considered with the other evidence presented at trial and with the affidavits (and materials attached thereto) of Drew C. McConaghy and Craig E. Smith, would have been highly susceptible to significant impeachment.[10] Such testimony would not be "substantially exculpatory", which is to say that it was not likely to be of much help to Eagle Thunder. *See Jagim,* 978 F.2d at 1040; *cert. denied,* —— U.S. ——, 113 S.Ct. 2447, 124 L.Ed.2d 664 (1993); *McConnell,* 903 F.2d at 571; *DeLuna,* 763 F.2d at 920. Moreover, Eagle Thunder has failed to establish that severance and a separate trial would have cured his impeachment problems. *See Lyles,* 593 F.2d at 192. I therefore cannot conclude that the District Court's refusal to grant severance "clearly prejudiced" Eagle Thunder or had a substantial and injurious effect or influence on the outcome of the case. *Jagim,* 978 F.2d at 1040; *cert. denied,* —— U.S. ——, 113 S.Ct. 2447, 124

---

10. In addition, some of the testimony, and in particular, Eagle Thunder's statements concerning a sexual encounter at his home between VLG and Myron Touche would probably not have even been admissible under Fed.R.Evid. 412, 403 and applicable Eighth Circuit precedent. *United States v. Eagle Thunder,* 893 F.2d at 954; *see also, United States v. Azure,* 845 F.2d at 1/05–06 (8th Cir.1988) (evidence of victim's past sexual behavior not admissible under Rule 412); *United States v. Shaw,* 824 F.2d at 601, 602–608 (same); *Shaw v. United States,* 812 F.Supp. at 158–60 (such evidence not "constitutionally required" under Rule 412); *compare United States v. Bear Stops,* 997 F.2d 451, 453–58 (8th Cir.1993). Evidence of VLG's alleged sexual encounter with Myron Touche would probably not be admissible for impeachment or any other purpose either. *Eagle Thunder,* 893 F.2d at 954; *see, Azure,* 845 F.2d at 1506 (such evidence not admissible for impeachment purposes to "prove the victim's capability to fabricate a story"); *United States v.* *Bartlett,* 856 F.2d 1071, 1087–89 (8th Cir.1988) (such evidence not admissible to show victim falsely accused perpetrator); *United States v. Duran,* 886 F.2d 167, 169 (8th Cir.1989) (such evidence not admissible to show the victim's promiscuity); *United States v. St. Pierre,* 812 F.2d 417, 419 (8th Cir.1987) (such evidence not admissible to show the victim's sexual sophistication); *United States v. Bear Stops,* 997 F.2d at 458; (same; such evidence also not admissible to challenge the accuracy of the victim's identification of the perpetrator); *United States v. Provost,* 921 F.2d 163, 165 (8th Cir.1990) *cert. denied,* 499 U.S. 968, 111 S.Ct. 1603, 113 L.Ed.2d 666 (1991); (such evidence not admissible for general impeachment purposes); *see also United States v. Dennis,* 625 F.2d 782, 797 (8th Cir.1980) (which would prohibit Eagle Thunder from calling any witnesses in an effort to establish VLG's involvement with Myron Touche as collateral impeachment under Fed.R.Evid. 608(b)).

L.Ed.2d 664 (1993); *McConnell,* 903 F.2d at 571; *Kopelciw,* 815 F.2d at 1237–38. There being no prejudicial error warranting a new trial, *id.; see also Lyles,* 593 F.2d at 192, Eagle Thunder's severance claim must be denied.[11]

### VII. Ineffective Assistance of Counsel.

Eagle Thunder also argues, in "Ground Six" of his Amended Motion, that he received ineffective assistance of counsel. He points to seven instances of alleged incompetent representation on the part of his trial counsel. Each of these instances will be addressed in seriatim.

The test formulated by the United States Supreme Court for determining whether counsel has rendered constitutionally ineffective assistance of counsel is a highly demanding one and contains two components: (1) deficient performance; and (2) prejudice. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984); *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 2586–87, 91 L.Ed.2d 305 (1986). To set aside a conviction on the ground of ineffective assistance of counsel, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that the result of the proceeding was rendered unreliable or fundamentally unfair by counsel's deficient performance. *Lockhart v. Fretwell,* — U.S. —, ——, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993); *see also Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).

The first component of the *Strickland* test is nothing more than a restatement of attorney competence already set forth in *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); and *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). *See Strickland,* 466 U.S. at 687–91, 104 S.Ct. at 2064–67; *see also, Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The second, or "prejudice" component, on the other hand, focuses on whether counsel's de-

ficient performance renders the result of the trial proceeding unreliable or fundamentally unfair. *Fretwell,* — U.S. at ——, 113 S.Ct. at 844; *see also Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Kimmelman,* 477 U.S. at 393, 106 S.Ct. at 2592 (Powell, J., concurring). Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him. *Fretwell,* — U.S. at ——, 113 S.Ct. at 844.

### A. FAILURE TO PROPERLY PRESERVE AND RENEW MOTIONS FOR SEVERANCE.

Eagle Thunder initially contends that he received ineffective assistance when his trial counsel failed to properly preserve and renew motions for severance. The Eighth Circuit, however, appears to have already decided that Eagle Thunder was not prejudiced by the District Court's refusal to grant his severance motion and, in doing so, has foreclosed him from obtaining relief on this ground. Yet, even assuming otherwise, *arguendo,* any deficient performance on the part of trial counsel as a result of failing to renew and preserve the severance issue for review, did not prejudice Eagle Thunder or make the jury's verdicts "unreliable or fundamentally unfair." *Id.; see also ante* at 1379–1381.

### B. FAILURE TO INFORM THE COURT THAT THE JOINDER INFRINGED ON EAGLE THUNDER'S RIGHTS TO TESTIFY AND TO PRESENT WITNESSES IN HIS OWN BEHALF.

Eagle Thunder next asserts that his trial counsel's failure to inform the Court that his joinder with Garneaux infringed on his right to testify and his right to present witnesses in his own behalf. A review of the record reveals that this assertion is not altogether accurate. Trial counsel moved for a separate trial on Count I (the Kidnapping offense) and

---

**11.** In fact, based on the record, it appears that Eagle Thunder voluntarily waived his right to testify and to call Quilt in his behalf; *see El-Tabech v. Hopkins,* 997 F.2d 386, 388–90 (8th Cir.1993); *United States v. Bernloehr,* 833 F.2d 749, 751–52 (8th Cir.1987), and for this reason his claim should likewise be denied.

also moved for severance on the basis of prejudicial joinder. In the affidavits and the memorandum submitted in support of the motions, counsel indicated that Eagle Thunder wanted to testify as to the kidnapping charge and that Eagle Thunder and Garneaux had antagonistic defenses. The motions were denied on their merits in a written order entered by the District Court. It appears that the concerns now being raised by Eagle Thunder were, in substance, presented to the Court for its consideration. The fact that the Court ruled against Eagle Thunder on the severance issue does not establish that the performance of his trial counsel was deficient. *Strickland*, 466 U.S. at 687, 689, 104 S.Ct. at 2064, 2065. Nevertheless, any assumed deficiency on the part of trial counsel did not prejudice Eagle Thunder or affect the outcome of the case. *Fretwell*, —— U.S. at ——, 113 S.Ct. at 844; *see also ante* at 1380–1381.

### C. OVERRIDING EAGLE THUNDER'S CONSTITUTIONAL RIGHT TO TESTIFY AND PRESENT WITNESSES IN HIS OWN BEHALF.

Eagle Thunder claims that his trial counsel "overrode" his desire to testify and present witnesses in his own behalf based on an "agreement" reached between his counsel, Garneaux's counsel and Garneaux himself. Under the "agreement", neither Garneaux, Eagle Thunder nor Eagle Thunder's mother, Elizabeth Quilt, would testify at trial. According to Eagle Thunder, the "agreement" was requested by Garneaux because Garneaux knew that Eagle Thunder would testify truthfully and by doing so, exculpate Eagle Thunder and incriminate Garneaux. Eagle Thunder maintains that his trial counsel provided him ineffective assistance by entering into an "agreement" with Garneaux which prevented him from exercising his right to testify on his own behalf and to call Quilt as a witness.

The affidavit of trial counsel indicates that on at least two occasions during the course of the trial, counsel discussed with Eagle Thunder whether Eagle Thunder should testify on his own behalf. Although counsel makes reference in his affidavit to having "discussions" with Garneaux's trial counsel, he makes no mention of any "agreement" being made as to whether or not Eagle Thunder, Garneaux or Quilt would testify. Instead, counsel indicates that Eagle Thunder fully understood the ramifications of testifying versus not testifying and made the final decision not to take the stand. This decision, according to counsel, was made for tactical reasons in the context of the trial itself. Counsel maintains that the decision not to call Quilt was likewise a tactical one based in part on counsel's belief that Quilt's testimony would not be overly helpful to Eagle Thunder's defense.

Even assuming the existence of an "agreement" such as the one alleged by Eagle Thunder, it appears from the record that Eagle Thunder knowingly and voluntarily waived his right to testify on his own behalf. *El–Tabech v. Hopkins*, 997 F.2d at 388–90; *United States v. Bernloehr*, 833 F.2d at 751–52. Eagle Thunder made no objection when his trial counsel rested without calling him to the stand. The accused must act "affirmatively" in these circumstances and may not, as Eagle Thunder did, indicate at trial his apparent acquiescence in his counsel's advice that he not testify, and then later claim that his will to testify was "overcome". *Bernloehr*, 833 F.2d at 752 (citations omitted). The record reveals that Eagle Thunder was present during a conference in chambers with the District Court, where proposed jury instructions regarding the fact that he did not testify were discussed. Eagle Thunder said nothing at that time. His conduct during trial and at the chambers conference with the Court impugns his claim that he wished to testify at trial but was "muzzled" into silence by his counsel. *El–Tabech v. Hopkins*, 997 F.2d at 388–89. This being the case, counsel cannot be said to have provided Eagle Thunder ineffective assistance under the standards previously outlined. *See ante* at 1381–1382.

The same reasoning and rationale applies with equal force to Eagle Thunder's contention that trial counsel "overrode" his right to call Quilt as a witness by making an "agreement" with Garneaux. Eagle Thunder had more than ample opportunity to express his desire to have Quilt testify as a defense

witness, but chose not to do so. On this record, it appears that Eagle Thunder heeded to his trial counsel's advice and waived any right he had to call Quilt as a matter of trial strategy. Such a waiver defeats any assertion that Eagle Thunder was denied effective assistance because of trial counsel's decision not to call Quilt.

■ Yet, even if the record does not conclusively support a waiver of Eagle Thunder's right to testify and call Quilt as a witness, he still has failed to establish either deficient performance or prejudice so as to entitle him to relief on ineffective assistance grounds. Trial counsel states in his affidavit that if Eagle Thunder took the stand and implicated Garneaux, then Garneaux would have taken the stand and implicated Eagle Thunder in accordance with the statement Garneaux had previously given to law enforcement officials. If Garneaux testified and did not inculpate Eagle Thunder, Garneaux would have been impeached with his prior statement. Moreover, the record indicates that Eagle Thunder would have been impeached with his own prior statements to officials from law enforcement had he testified to what is stated in his September 19, 1993 affidavit. Counsel also indicates in his affidavit that he believed the credibility of both VLG and JTL was in question because both children had substantially changed their stories at trial. Finally, it was counsel's opinion that Quilt would not have offered testimony of any substantial benefit to the defense and, had she testified, would have been discredited by her own prior statements. Eagle Thunder, in my view, has failed to show that trial counsel's decision not to call him or Quilt as witnesses was anything but sound trial strategy based on the circumstances of the case. *El–Tabech v. Hopkins,* 997 F.2d at 390. Moreover, since it is likely that additional inculpatory evidence would have been admitted had Eagle Thunder and Quilt testified, the failure to call them does not render the sexual abuse convictions unreliable. *Id.* Eagle Thunder, therefore, cannot prevail on this portion of his ineffective assistance of counsel claim.

**D. FAILURE TO INVESTIGATE AND PRESENT AVAILABLE EVIDENCE OF MOTIVE, (I.E., THAT THE VICTIM HAD A MOTIVE TO TESTIFY OR FALSELY ACCUSE EAGLE THUNDER).**

■ In addition, Eagle Thunder maintains that he received ineffective assistance because his trial counsel failed to investigate and present available evidence that VLG had a motive to testify and/or falsely accuse Eagle Thunder of raping her. Counsel details in his affidavit the efforts he and an investigator hired to assist him went through to investigate the case and, in particular, VLG's prior sexual behavior with Myron Touche and/or others. Counsel, however, states that he was never able to verify whether or not VLG had engaged in such behavior. Whether counsel's investigation was professionally reasonable under the circumstances appears to be a question of fact. Even if, without deciding, counsel's investigation was objectively below par, Eagle Thunder was not prejudiced by it because VLG's prior sexual behavior, if the same ever existed, would not have been admissible under Fed.R.Evid. 412, 403 and/or and 608(b). *See ante* at 1380, n. 10; *see also United States v. Eagle Thunder,* 893 F.2d at 954. Eagle Thunder was in no way prejudiced by his counsel's failure to investigate and delve into matters that were clearly not admissible at trial. Eagle Thunder's ineffective assistance claim thus must be denied on this ground as well.

**E. FAILURE TO OBJECT AT TRIAL TO THE HEARSAY OF MARY PAT MUELLER.**

Eagle Thunder next asserts that his trial counsel's failure to object at trial to the hearsay testimony of Mary Pat Mueller demonstrates that his counsel was constitutionally inadequate. Mueller was called in the Government's case in chief and testified about various statements VLG made to her while at the hospital. Prior to trial, the Government provided Eagle Thunder with notice of its intent to offer VLG's hearsay testimony through both Mueller and Dr. Mary Carole Curran. Eagle Thunder's counsel filed an objection to the notice and a

supporting memorandum of law. The District Court determined that VLG's statements to both Mueller and Curran were admissible. Based on the record before me, another objection at trial to the admission of Mueller's hearsay testimony, while perhaps prudent for purposes of preserving the issue for direct and collateral review, would not have made any difference. As discussed previously, ante at 1376–1377, the hearsay testimony was admissible and did not violate Eagle Thunder's rights under the Confrontation Clause. Counsel's failure to object to this testimony, therefore, did not prejudice Eagle Thunder (because the same was admissible) or in any way taint the reliability of his two convictions.

### F. FAILURE TO REQUEST QUESTIONS REGARDING RACE AND RACIAL BIAS DURING VOIR DIRE.

 Eagle Thunder further argues that his trial counsel failed to request questions regarding race and racial bias during voir dire and that the failure to do so rendered his counsel ineffective. Two weeks before trial, counsel filed a five-page set of proposed voir dire questions for the District Court to use. Several of the questions proposed pertained to race and racial bias. The Court itself conducted voir dire and did not afford either counsel an opportunity to ask the venire questions. The Government, based on the affidavit of its own trial counsel, Dennis R. Holmes, alleges that the voir dire transcript on file is incomplete. Specifically, the Government alleges that the transcript does not completely reflect the Court's questions and comments to the jury.[12] The Court may very well have asked the prospective jurors questions concerning race and racial bias and may have done so from the proposed list of questions submitted by counsel. Unfortunately, what specific questions were asked during the voir dire process is not known because of an incomplete transcript. Regardless of whether the Court questioned the venire on the issue of racial prejudice, Eagle Thunder has failed to cite any authority, and I can find none, that would have required the Court, in this instance, to make such an inquiry.[13] Under these circumstances, and given the state of the case law at the time,[14] counsel acted well within the bounds of a competent professional and, for this reason

12. Apparently, the District Judge's court reporter at the time did not make any stenotype notes of the voir dire that involved the Judge reading his prepared statement to the venire. According to the affidavit of Holmes, this process typically took an hour or more. Holmes states that he spoke to Richard A. Christoffer, the court reporter who transcribed the stenotype notes and tape recording of his predecessor, and Christoffer informed Holmes that the transcription was a very difficult process because of the inadequacy of both the stenotype notes and the poor quality of the tape recording that was left by the Judge's court reporter. *See* Affidavit of Dennis R. Holmes (filed November 1, 1993).

13. Eagle Thunder does, however, cite *Turner v. Murray*, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) in support of his proposition that the District Court's failure to question prospective jurors about racial prejudice denied him a fair trial by an impartial jury and constituted reversible error. *See* Amended Motion, Ground Seven (filed September 24, 1993). In *Turner*, the Supreme Court vacated the defendant's death sentence and held that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. 476 U.S. at 36–37, 106 S.Ct. at 1688–89. The Court

though refused to disturb the defendant's conviction and found that, with respect to the guilt phase of the defendant's trial, the principles previously enunciated in *Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976) should continue to be adhered to. 476 U.S. at 37–38, 106 S.Ct. at 1688–89. In *Ristaino*, the defendant was one of three black men charged with assaulting a white security guard with intent to murder him. There, the Court held that inquiry into racial prejudice at voir dire was not constitutionally required because the facts of the case "did not suggest a significant likelihood that racial prejudice might infect [the defendant's] trial". 424 U.S. at 598, 96 S.Ct. at 1022. The Court thus in both *Turner* and *Ristaino*, made clear that a trial judge is not mandated to ask prospective jurors about racial prejudice unless "special circumstances" exist that create a particularly compelling need to inquire into this subject matter. 476 U.S. at 38, n. 12, 106 S.Ct. at 1689, n. 12; *see also, Rosales–Lopez v. United States*, 451 U.S. 182, 189–94, 101 S.Ct. 1629, 1634–37, 68 L.Ed.2d 22 (1981).

14. *See Turner v. Murray*, 476 U.S. 28, 106 S.Ct. 1683; *Rosales–Lopez v. United States*, 451 U.S. 182, 101 S.Ct. 1629; *Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017; *Connors v. United States*, 158 U.S. 408, 15 S.Ct. 951, 39 L.Ed. 1033 (1895).

alone, Eagle Thunder's ineffective assistance argument must fail. The argument must also fail because Eagle Thunder has failed to establish that he was prejudiced by any lack of racial bias questioning to such an extent that the result of the trial would properly be considered "unreliable".

### G. FAILURE TO INVESTIGATE AND/OR PRESENT EVIDENCE THAT THE TEARS IN VLG'S VAGINA WERE DUE TO INTERCOURSE WITH MYRON TOUCHE.

Finally, Eagle Thunder argues that his trial counsel failed to investigate and/or present evidence that VLG's vaginal tears were due to sexual intercourse with Myron Touche. Counsel attempted on several occasions to contact Dr. Van Ert, who examined VLG within hours of the rape, but Van Ert would not meet with or talk to counsel. He also met with Dr. Williams, another physician who examined VLG, but after doing so, concluded that Williams, if called upon to testify, would only reinforce Van Ert's opinion that the vaginal tears had been made "just hours" before the rape examination. This evidence clearly exculpated Touche as the rape perpetrator.[15]

In any event, evidence that VLG had sexual intercourse with Touche on one or more occasions would not have been admissible under Fed.R.Evid. 412, 403 and/or 608(b). *See ante* at 1380, n. 10; *see also United States v. Blue Horse,* 856 F.2d 1037, 1040 (8th Cir.1988).

On the facts of this case, trial counsel acted diligently in investigating VLG's vaginal tears. Moreover, because the evidence in question was inadmissible, Eagle Thunder was not prejudiced by his counsel's conduct.

### VIII. Voir Dire Questioning.

In "Ground Seven" of his Amended Motion (his final ground for relief), Eagle Thunder contends that the District Court's failure to question prospective jurors about racial prejudice deprived him of a fair trial by an impartial jury.

As an initial matter, Eagle Thunder failed to raise his voir dire contention to the Eighth Circuit in his 1989–90 appeal. He offers no "cause" for this failure, and I can find none in the record. Although Eagle Thunder has raised a seven-prong ineffective assistance of counsel claim, he does not assert that his appellate counsel was incompetent or attempt here to argue as such in an effort to overcome his procedural default. *See ante* at 1372–1373. He likewise has not made a showing of factual innocence. He thus is procedurally barred from pursuing his voir dire contention in this § 2255 action. *Id.*

The procedural bar matter notwithstanding, Eagle Thunder's motion fails on the merits as well.

Contrary to Eagle Thunder's assertions, *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683 does not control here.[16] *See ante* at 1384, n. 13. Unlike in *Turner,* Eagle Thunder was not charged with a capital offense or one involving interracial violence. *See Turner,* 476 U.S. at 33, 106 S.Ct. at 1688–87; *see also, Rosales–Lopez v. United States,* 451 U.S. at 184–85, 101 S.Ct. at 1632–33. *Ristaino v. Ross,* 424 U.S. at 589–90, 96 S.Ct. at 1018. Nothing about the facts of Eagle Thunder's case suggests that there was a significant risk of racial prejudice likely to infect the trial. Eagle Thunder argues that given the climate of "racial prejudice" in the State of South Dakota, the District Court should have questioned the venire about racial bias. The record, however, does not

---

**15.** Eagle Thunder does not allege, in either his Amended Motion or in any of the supporting affidavits, that Touche had sexual intercourse with VLG within "hours" or even a short time before the rape examination conducted at the hospital in Chamberlain. Eagle Thunder does make reference, in his own affidavit, to observing Touche and VLG engaging in sexual intercourse in Eagle Thunder's home shortly before Eagle Thunder was arrested. This incident, assuming

it did occur, could have only taken place subsequent in time to both the rape incident and Van Ert's examination of VLG.

**16.** For a chronology of the Supreme Court's cases dealing with the requirements of voir dire, *see Mu'Min v. Virginia,* 500 U.S. 415, 420–24, 111 S.Ct. 1899, 1903–04, 114 L.Ed.2d 493 (1991).

affirmatively show that venire was *not* questioned on this subject matter, (but instead is silent on this issue). More importantly, to accept Eagle Thunder's argument would mean that every Native American tried in this State, based only on an alleged aura of "racial prejudice", would be entitled to have the trial judge probe prospective jurors about racial prejudice. Such a result is certainly not required by *Turner, see* 476 U.S. at 33–38 & n. 7, 10, 12, 106 S.Ct. at 1686–89 & n. 7, 10, 12 and is not required here.[17] *Llach v. United States,* 739 F.2d 1322, 1331–32 (8th Cir.1984). Finally, I can find no "special circumstances" that existed in the context of the trial that created a compelling need to inquire into the racial prejudice of the venire. *Turner,* 476 U.S. at 33–38, 106 S.Ct. at 1686–89; *Rosales–Lopez,* 451 U.S. at 189–94, 101 S.Ct. at 1634–37; *Ristaino,* 424 U.S. at 595–98, 96 S.Ct. at 1020–22; *Llach,* 739 F.2d at 1332–33. Instead, even assuming that the venire was not questioned at all about racial bias, Eagle Thunder has failed to establish that the Court abused its discretion and that he was prejudiced therefrom. As such, Eagle Thunder is not entitled to relief on this issue. *Id.*

## REPORT AND RECOMMENDATIONS FOR DISPOSITION

Based on the foregoing findings of fact and legal discussion, and in accordance with 28 U.S.C. § 636(b)(1)(B), I would recommend that Eagle Thunder's 28 U.S.C. § 2255 motion filed on September 24, 1993 be dismissed on the merits and with prejudice.

Dated this 6th day of January, 1994.

---

17. In fact, the Supreme Court in *Turner* observed that it was in no way requiring or suggesting that a trial judge broach the subject of racial prejudice *sua sponte,* even when defense counsel declines to request voir dire on the topic. 476 U.S. at 37, n. 10, 106 S.Ct. at 1688–89, n. 10.